2020 IL App (1st) 182034-U

FIFTH DIVISION
October 16, 2020

No. 1-18-2034

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 5008 |
| | ) | |
| STEPHEN JOHNSON, | ) | |
| | ) | Honorable Allen F. Murphy, |
| Petitioner-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justice Cunningham concurred in the judgment.
Justice Hoffman dissented.

**ORDER**

¶ 1  *Held:*  We reverse the circuit court's summary dismissal of petitioner's postconviction petition at the first stage. The petition stated the gist of a claim of ineffective assistance of counsel.

¶ 2  Petitioner Stephen Johnson[1] appeals from an order of the circuit court of Cook County

summarily dismissing his petition for relief under the Post-Conviction Hearing Act (Act) (725

---

[1] Petitioner's first name appears in the record as both "Steven" and "Stephen". We adopt the spelling employed in our ruling on petitioner's direct appeal. See *People v. Johnson*, 2017 IL App (1st) 150858-U.

ILCS 5/122-1 *et seq.* (West 2016)) at the first stage. He contends that he raised an arguable claim of ineffective assistance of counsel for not advising him of the strength of the State's case and urging that he accept a plea offer under which he would have served less than the minimum sentence for the charged offense. We reverse and remand for additional proceedings.

¶ 3                                        BACKGROUND

¶ 4     Following a jury trial, petitioner was convicted of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010) (amended and re-codified at 720 ILCS 5/11-1.40(a)(1) (eff. Jan. 1, 2016)). On direct appeal, this court affirmed the conviction and sentence, rejecting petitioner's claims that the prosecutor's comments during closing arguments constituted reversible error and that his 20-year prison sentence was excessive. See *People v. Johnson*, 2017 IL App (1st) 150858-U. We detailed the evidence in that earlier decision, so here we only set forth the facts most relevant to the pending postconviction petition.

¶ 5     Petitioner was arrested in 2011 and remained in custody for several years before his 2014 trial. He was represented by several different private attorneys during that period. The record is largely silent as to any plea negotiations, but it does contain fleeting references to them. A few months before trial, there was discussion that the State had made petitioner a "substantial" offer that was "still on the table" which was less than the mandatory minimum. The court admonished petitioner. He indicated that he understood the offer, and understood that it was "[his] decision and [his] decision only" as to whether to accept it. Petitioner then agreed to continuing negotiations. At another court date, his attorney argued that petitioner's rejection of the plea offer "sp[o]ke to *** whether or not [he] would come to court." He stated that it showed petitioner wanted to face justice and "face his accuser;" that petitioner "wants a trial" and went to "great efforts" to "retain two attorneys and an expert." Further, it would be "hard to believe" that petitioner "would not come to trial." Counsel further stated that petitioner turned down a plea offer that would have led to his

immediate release due to the time he had already served in pretrial custody, so that he could face his accuser at a trial. No plea agreement having ever been reached, the case proceeded to trial on November 17, 2014.

¶ 6     The essential evidence at trial established that on February 26, 2011, 11-year-old J.G. attended a birthday party for her friend Ashley Harris at Harris's grandmother's house. The party included an overnight stay. Harris introduced J.G. to petitioner, who was Harris's uncle, and to co-defendant Daniel Rucker, petitioner's friend,[2] who were responsible for playing music at the party.

¶ 7     At some point, J.G. went to the basement to retrieve her cell phone and entered a room off the open area. Rucker followed her into the room and pushed her onto a bed. Rucker called petitioner into the room, stating that J.G. was "a feisty one," and had petitioner hold her hands and mouth so she could not scream or push him off. Rucker pulled J.G.'s leggings down and inserted his penis into her vagina. After five minutes, Rucker ejaculated on J.G.'s back and she pulled her pants up and went upstairs. J.G. told Raven Gray, petitioner's girlfriend and the mother of his children, that she had been raped.

¶ 8     J.G. then returned to the basement to look for her phone. She went to a room located near the laundry room and found her phone there. The room had a mattress in it. While she was inside the room, petitioner entered and pushed her onto the bed, pulled her leggings down, and inserted his penis into her vagina for approximately 10 minutes. J.G. was menstruating, and when petitioner stopped thrusting, he handed her a pillowcase and told her to wipe herself off and then return upstairs.

---

[2] Rucker pleaded guilty and was sentenced to seven years' imprisonment. He is not a party to this appeal.

¶ 9    Upstairs, J.G. again told Gray what happened and Gray brought Gina Maye, Harris's mother and petitioner's sister, into a bathroom with her and J.G. Petitioner and Rucker were listening outside the bathroom. Maye opened the bathroom door, and asked petitioner and Rucker what they did. The two men attempted to run, and Maye told her husband to get the other girls from the party to take them to her apartment located 15 minutes away in Indiana. J.G. spent the night in Maye's apartment separate from the other girls attending the sleepover.

¶ 10    The following morning, J.G. was crying during a performance at her church. Her aunt, Tameka Gatewood, followed her into a bathroom to find out why she was upset. J.G. described the occurrences from the prior night. Gatewood brought J.G. to the Lansing Police Department where she spoke with police and gave physical descriptions of petitioner and Rucker. She described petitioner has having a birthmark on his nose and a tattoo of lips on his neck. J.G. then went to a hospital for a sexual assault kit. A nurse swabbed her vaginal area, her fingers, and her mouth. J.G. later identified both petitioner and Rucker in a photographic array and physical lineup at the police station. She spoke with a doctor in a victim-sensitive interview regarding the incident, and at trial denied telling the doctor that petitioner raped her first and Rucker raped her second. Detective Wilson Pierce observed the victim-sensitive interview, and his notes indicated that J.G. had stated that Rucker was the second person to rape her.

¶ 11    Dana Tatgenhorst, a crime scene investigator for the Lansing Police Department, testified that he processed and photographed the house in question. There was a red stain on a mattress in the basement which, based on his training and experience, had the appearance of blood. There was also a substance on a pair of white tennis shoes that also, based on his training and experience, appeared to be consistent with blood. Tatenghorst collected the shoes. He cut and

collected a portion of the mattress to be made available for testing the stains. He also took a buccal swab of petitioner for DNA analysis.

¶ 12     Heather Wright, an expert in forensic DNA analysis, and Christopher Webb, an expert in forensic biology and DNA analysis, testified that they performed DNA analyses on the vaginal swabs from J.G.'s sexual assault kit, and compared them to buccal swabs from both petitioner and Rucker and a sample of J.G.'s blood. Wright performed an autosomal DNA analysis, which examined at 15 different "locations" and a gender marker in the DNA extracted from the vaginal swabs. Wright identified 3 of 15 possible "locations" in the minor profile, which was consistent with having a limited amount of semen. Based on those three locations, Wright could conclude that Rucker could be excluded as a contributor to the minor profile, and petitioner could not be excluded as a contributor. The statistical likelihood that petitioner would be included as a donor of the minor profile was 1 in 230 unrelated black individuals.

¶ 13     Webb conducted a Y-chromosome short tandem repeat markers (YSTR) analysis, which does not identify a specific person but instead shows the Y chromosome present in related males. Petitioner's buccal swab matched all 11 possible locations in the YSTR sample from the vaginal swabs. Thus, Webb concluded that the YSTR profile from the vaginal swabs matched petitioner's YSTR profile and did not match Rucker's profile. The statistical likelihood that an individual would match the YSTR profile was 1 in 1500 unrelated black males.

¶ 14     Dr. Ranjit Chakroborty, an expert in population genetics and DNA forensic statistics, testified that he combined the statistics from the autosomal DNA and YSTR analyses performed by Wright and Webb, respectively, using a mathematic equation generally accepted in the forensic science community. This analysis calculates the chance that a person has both the minor male profile from the autosomal markers and the Y chromosomal profile in the vaginal swabs.

He opined that, if a random unrelated black male was selected, there would be a 1 in 291,870 chance of matching the evidence sample. Dr. Chakroborty also provided a "likelihood ratio," which calculates how many individuals would have to be sampled to find one whose DNA mixed with the DNA of the victim to match the DNA mixture present in the vaginal swab evidence sample. The likelihood ratio is also generally accepted within the scientific community. Based on the results of Wright's and Webb's DNA analyses, Dr. Chakroborty concluded that 1 out of 83 million black people could have contributed to the particular mixture obtained from the vaginal swab.

¶ 15    Petitioner's expert in forensic DNA and biology, Dr. Karl Reich, agreed that the State's DNA experts' analyses were accurate, and the tests were widely used. However, Dr. Reich testified that his belief was that the DNA sample from the vaginal swab was too small to provide a suitable DNA profile for comparison, and the limited profile obtained from the autosomal DNA test was incomplete. Dr. Reich acknowledged that it is generally accepted to use a partial profile for comparison purposes. He disagreed with Dr. Chakroborty's use of the likelihood ratio, which he acknowledged was widely used, because it failed to take into account an error rate. Dr. Reich further testified that it is possible to test for DNA from stains on fabric, such as mattresses and pillowcases.

¶ 16    The jury found petitioner guilty. In allocution, petitioner stated: "I fought for my innocence. You know a plea was offered to me. I fought for my innocence. I could have took the plea, but I fought for my innocence and I plan on still doing that, because of what I had went through and I did not commit this crime. That's all I really have to say."

¶ 17    On April 17, 2014, petitioner filed a *pro se* postconviction petition contending, among other things, that his trial counsel was ineffective. In a supporting affidavit, he stated that the

6

State had offered him a five-year sentence in exchange for a guilty plea, and that counsel "only informed me of the offer, but failed to provide any meaningful dialog regarding the desirability of the State's offer." He further alleged that counsel did not "strongly urge" him to accept the offer. More particularly, counsel "never commented on whether or not he thought the 5 year offer was in [petitioner's] best interest." Petitioner understood that a five-year sentence was less than the minimum required under the charged offense. Further, he stated that his attorney's "communications consisted solely of his viewpoint of the weakness of the State's evidence against me." Petitioner concluded that his attorney's confidence in the weakness of the State's case and "adam[a]nt stance" led him to reject the offer. The petition does not allege that: (1) counsel misrepresented the applicable sentence range for the charged crimes; (2) there was any deficiency in how counsel actually tried the case; or (3) the court would have accepted the plea agreement. The petition also contains an affidavit from petitioner's mother, stating that it was she who had retained the private attorney, confirming her son's version of events.

¶ 18    On July 27, 2018, the circuit court summarily dismissed the petition as frivolous and patently without merit, stating: "I find that that claim has no merit in that it's the Defendant's decision and the Defendant's decision alone whether to plead guilty to a criminal offense. Whether a lawyer thinks it's in his best interest or not, a lawyer can't speak to that. That's for the Defendant to decide. So that complaint is absolutely baseless." Johnson's notice of appeal, filed on September 10, 2018, was late. However, the Illinois Supreme Court granted Johnson's motion for a supervisory order, and directed this Court to treat the notice of appeal as a properly perfected appeal from the circuit court's judgment dismissing Johnson's petition.

7

¶ 19               ANALYSIS

¶ 20    On appeal, petitioner contends that the trial court erred in summarily dismissing his postconviction petition at the first stage of proceedings. Petitioner argues that his trial counsel was at least arguably ineffective for "failing to urge him to accept the prosecution's plea offer of a 5-year sentence to a lesser offense than predatory criminal sexual assault of a child." Petitioner explains that, not having received advice to the contrary, he insisted on taking the case to trial.

¶ 21    The Act allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). Once a petitioner files a petition under the Act, the trial court must first, independently and without considering any argument by the State, decide whether the petition "is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). A postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* A claim completely contradicted by the record is an example of an indisputably meritless legal theory. *Id*. Fanciful factual allegations include those that are fantastic or delusional. *Id*. at 17.

¶ 22    To survive dismissal at this initial stage, the postconviction petition "need only present the gist of a constitutional claim," which is "a low threshold" that requires the petition to contain only a limited amount of detail. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). The *Hodges* court "reemphasized the liberal standard" used to evaluate *pro se* postconviction petitions, instructing courts to view them "with a lenient eye, allowing borderline cases to proceed to stage two." *People v. Carballido*, 2011 IL App (2d) 090340, ¶¶ 38-39. In addition, all well-pleaded facts must be taken as true unless "positively rebutted" by the trial record. *People v. Coleman*,

183 Ill. 2d 366, 385 (1998). We review a trial court's summary dismissal of a postconviction petition *de novo*. *People v. Simms*, 192 Ill. 2d 348, 360 (2000).

¶ 23    In this case, petitioner alleged ineffective assistance of trial counsel. Those claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Id.* (citing *Strickland,* 466 U.S. at 687). Applied to a first-stage postconviction petition, "a petition alleging ineffective assistance may *not* be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphases added.) *Hodges*, 234 Ill. 2d at 16-17. Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Petrenko*, 237 Ill. 2d at 496-97; *Strickland*, 466 U.S. at 690, 694. In this case, petitioner's ineffective assistance claim is predicated upon trial counsel's alleged failure to advise him to accept an offer for a five-year sentence in exchange for his guilty plea to a lesser charge.

¶ 24    A criminal defendant personally possesses a constitutional right to elect what plea to enter. See *People v. Phillips,* 217 Ill. 2d 270, 281 (2005) ("The *** five decisions that ultimately belong to the defendant in a criminal case after consultation with his attorney: (1) what plea to enter; (2) whether to waive a jury trial; (3) whether to testify in his own behalf; (4) whether to tender a lesser-included-offense instruction; and (5) whether to appeal."). Underlying a defendant's constitutional right to personally either plead guilty or not guilty is the constitutional

right to be reasonably informed with respect to the direct consequences of accepting or rejecting a guilty-plea offer from the State. A criminal defendant has the constitutional right to be *reasonably* informed with respect to the direct consequences of accepting or rejecting a plea offer. *United States v. Day,* 969 F. 2d 39, 43 (3d Cir. 1992); *Beckham v. Wainwright,* 639 F. 2d, 262, 267 (5th Cir. 1981); *People v. Correa,* 108 Ill. 2d 541, 549 (1985) (voluntariness of guilty plea depends upon whether the defendant had effective assistance of counsel); *Hill v. Lockhart,* 474 U.S. 52, 56-57 (1985) (same).

¶ 25    We find that this case is largely governed by *People v. Hale*, 2013 IL 113140. There, our supreme court discussed the then-recently decided companion cases of *Missouri v. Frye*, 566 U.S. ——, 132 S. Ct. 1399 (2012), and *Lafler v. Cooper*, 566 U.S. ——, 132 S. Ct. 1376 (2012), in which the United States Supreme Court addressed ineffective-assistance-of-counsel issues relating to failure to accept a plea offer. *Hale*, 2013 IL 113140, ¶ 19. The *Hale* court explained:

> " 'To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.' "
> (Emphasis in original.) *Id*. (quoting *Frye*, 566 U.S. at ——, 132 S. Ct. at 1409).

¶ 26 Thus, to prevail on a claim that a trial attorney's given deficient performance denied a defendant his constitutional right to the effective assistance of counsel during guilty-plea negotiations with the State, a defendant must also demonstrate that (1) a reasonable probability existed that he would have accepted the guilty-plea offer absent counsel's deficient performance and (2) the guilty-plea offer would have been entered without the prosecution rescinding the offer or the court's refusing to accept the parties' agreement. *Id.*; *People v. Jellis*, 2016 IL App (3d) 130779, ¶ 29.

¶ 27 The *Hale* court held that a defendant's showing of prejudice must encompass more than his own self-serving testimony. *Id.* ¶ 18. Rather, there must be " 'independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice,' and not on other considerations." *Id.* (quoting *Curry,* 178 Ill.2d at 532). Here, the petition is supported by the affidavit of petitioner's mother. Also, "[t]he disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered supportive of a defendant's claim of prejudice." *Id.*

¶ 28 The State cites the *Hale* court's discussion regarding a defendant's obligation to show a reasonable probability that the State would not have withdrawn the plea and the court would have accepted the guilty-plea agreement. See *id*. at ¶ 19. The State faults petitioner for not addressing those points in his petition. But the *Hale* court had before it the full record of an evidentiary hearing on a motion for a new trial. In fact, the *Hale* court specifically noted that it was resolving the matter based its finding that the circuit court's determination that the defendant's testimony was incredible was not against the manifest weight of the evidence. *Id.* ¶ 24.

¶ 29    Here, in contrast, the postconviction petition must merely state the "gist" of a constitutional violation. *People v. Brown*, 236 Ill. 2d 175, 184. Credibility determinations are not made until a third-stage hearing. *People v. Coleman*, 183 Ill. 2d 366, 380 (1998).

¶ 30    Petitioner's allegation that he rejected a plea offer for substantially less prison time than he received after trial because defense counsel did not inform him of the strength of the State's case stated the gist of a claim of ineffective assistance of counsel. Also, taking petitioner's claims as true, there was a reasonable probability that the end result of the criminal process would have been more favorable had he accepted the plea offer, since his actual sentence of 20 years' imprisonment was significantly longer than the 5 years allegedly offered by the State.

¶ 31    Postconviction petitions based on ineffective assistance of counsel during guilty-plea negotiations with the State are almost always based on matters that occur outside the record. *People v. Williams*, 2016 IL App (4th) 140502, ¶ 44. Since the court must take the allegations of the postconviction petition as true at the first stage, petitions such as the one now before us will often meet the lenient first-stage requirements and be advanced for a further hearing. See *id*.

¶ 32    However, a court may dismiss a postconviction petition at the first stage if the trial record "contradicts" its allegations. *People v. Torres*, 228 Ill. 2d 382, 394 (2008), *citing People v. Coleman*, 183 Ill. 2d 366, 381-82 (1998). The State argues that the record positively rebuts petitioner's claim that he rejected the offered plea agreement because his attorney failed to competently advise him. The State contends that petitioner rejected the plea deal simply based on his protestations of innocence. The State points to statements by trial counsel that petitioner was eager to go to trial and petitioner's statements in allocution. However, the attorney's statements on this issue are of no moment; one would hardly expect the attorney to have told the court that his client had turned down the plea deal because he had been misadvised of his prospects at trial.

See *People v. Lawton*, 212 Ill. 2d 285, 296 (2004) (explaining that a lawyer faces an "inherent conflict of interest" when he argues his own ineffectiveness). As for petitioner's statements in allocution, there is simply not an adequate record to determine whether his professed innocence was the sole reason that he turned down the plea agreement. It is entirely possible petitioner was both (1) eager to clear his name and face his accuser and (2) badly misadvised about his prospects at trial. Therefore, we cannot say with certainty that the record positively rebuts the petition's claims.

¶ 33    At this stage of the proceedings, the bar is quite low. Therefore, the statement from the defendant as well as his mother's sworn statement, asserts that the defense lawyer did not address the pros and cons of the plea deal with defendant but rather the lawyer seemed to suggest that it was not a good deal. The defendant and his mother contend that they expected the lawyer to give defendant his best advice based on his experience and knowledge and he did not. They imply, but do not explicitly state, that the lawyer suggested that the defendant should not take the plea deal because he had the better part of the argument. While that may turn out not to be true, we must accept it as true at this stage of the proceedings, and advance the case to the next stage.

¶ 34                                  CONCLUSION

¶ 35    We find that the petition states the gist of a constitutional claim for ineffective assistance of counsel. We reverse the circuit court's summary dismissal of petitioner's *pro se* postconviction petition and remand this cause for second-stage proceedings, including the appointment of counsel. We emphasize that we express no opinion on the ultimate outcome of those proceedings.

¶ 36    Reversed and remanded.

¶ 37    JUSTICE HOFFMAN, dissenting:

¶ 38    I have no quarrel with the majority's statement of the law or the facts. My disagreement is with the majority's application of the law to the facts. As a consequence, I dissent.

¶ 39    The defendant has appealed from the first-stage dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He claims that his trial attorney rendered ineffective assistance by not advising him of the strength of the State's case and "failing to urge him to accept the prosecution's plea offer of a 5-year sentence to a lesser offense than predatory criminal sexual assault of a child." He contends that, not having received advice to accept the plea offer, he elected to plead not guilty and proceed to trial.

¶ 40    A postconviction proceeding consists of three phases. At the first stage, the circuit court may, within 90 days of the filing of a petition under the Act, dismiss a petition as frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016). A claim completely contradicted by the record is meritless. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009).

¶ 41    The record in this case establishes that, prior to trial, the State made the defendant an offer of a sentence that was less than the mandatory minimum in exchange for his plea of guilty to a lesser offense than predatory criminal sexual assault of a child for which he was charged. As the majority notes, the trial court admonished the defendant and the defendant indicated that he understood the State's offer and understood that it was his decision, and his decision only, to accept or reject the plea offer. At a subsequent hearing, the defendant's trial attorney informed the trial court that the defendant had rejected the State's plea offer and that the defendant "wants a trial." He stated that the defendant turned down the plea offer that would have led to his immediate release due to the time he had been in pretrial custody. According to his trial attorney, the defendant turned down the plea offer so that he could face his accuser at trial.

14

¶ 42 Following a jury trial, the defendant was found guilty of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1 (a)(1) (West 2010)). Prior to being sentenced, the defendant stated the following in allocution: "I fought for my innocence. You know a plea was offered to me. I fought for my innocence. I could have took the plea, but I fought for my innocence and I plan on still doing that, because of what I had went through and I did not commit this crime." Thereafter, the trial court sentenced the defendant to 20 years' incarceration. On direct appeal, this court affirmed the defendant's conviction and sentence. *People v. Johnson*, 2017 IL App (1st) 150858-U.

¶ 43 It was the defendant's personal right to accept or reject the State's plea offer and to elect what plea to enter. *People v. Phillips*, 217 Ill. 2d 270, 281 (2005). In making those decisions, a defendant has the constitutional right to be informed of the direct consequences of accepting or rejecting a plea offer. *United States v. Day*, F.2d 39, 43 (3d Cir. 1992). I believe that the record reflects that the defendant was so informed and voluntarily elected to reject the State's plea offer.

¶ 44 The defendant was clearly advised of the State's plea offer as evidenced by the defendant's statements when admonished by the trial court and in allocution prior to being sentenced. He understood that the decision to accept or reject the plea offer was his alone. Prior to trial, the defendant's attorney informed the trial court that the defendant wanted a trial so that he could face his accuser. The defendant has made no allegation that his attorney misrepresented the applicable sentencing range for the charged crimes. The majority states that the defendant and his mother "imply" that his trial attorney suggested that he should not accept the State's plea offer. I find nothing in the defendant's petition supporting such an implication. The majority also states that the statements of the defendant's attorney are of "no moment." I disagree. The attorney's statements to the trial court explained the defendant's reason for rejecting the plea

offer: he "wants a trial" so that he could face his accuser. The attorney's statements in this regard are corroborated by the defendant's own statement in allocution: "I could have took the deal, but I fought for my innocence."

¶ 45     Contrary to the majority's conclusion, I believe that the record positively rebuts the petitioner's claims that, not having received advice from his attorney to accept the plea offer, he elected to plead not guilty and proceed to trial. Consequently, I would affirm the trial court's first stage dismissal of the defendant's postconviction petition.